ORIGINAL

1   Joseph R. Saveri (State Bar No. 130064)
    Eric B. Fastiff (State Bar No. 182260)
2   Brendan P. Glackin (State Bar No. 199643)
    Andrew S. Kingsdale (State Bar No. 255669)
3   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 29th Floor
4   San Francisco, CA 94111-3339
    Telephone: (415) 956-1000
5   Facsimile: (415) 956-1008

6   [Additional counsel listed on signature page.]

7   *Attorneys for Plaintiff and the Proposed Class* E-filing

8

9                       UNITED STATES DISTRICT COURT

10                    NORTHERN DISTRICT OF CALIFORNIA

11                         SAN FRANCISCO DIVISION

12  ALEC BEREZIN, individually and on behalf of all      Case No.
    others similarly situated,
13                                                       CV 10 1533
                  Plaintiff,
14                                                       **CLASS ACTION COMPLAINT**
    v.
15                                                       **JURY TRIAL DEMAND**
    HITACHI, LTD.; NEC CORPORATION;
16  SAMSUNG ELECTRONICS CO. LTD.; SHARP
    CORPORATION; TOSHIBA CORPORATION; LG
17  ELECTRONICS, INC.; SONY CORP.; SONY
    OPTIARC AMERICA INC.; SONY OPTIARC INC.;
18  LITE-ON IT CORP OF TAIWAN; HITACHI-LG
    DATA STORAGE, INC.; TOSHIBA SAMSUNG
19  STORAGE TECHNOLOGY CORP.; KONINKLIJKE
    PHILIPS ELECTRONICS N.V.; PHILIPS & LITE-
20  ON DIGITAL SOLUTIONS CORP.; and PHILIPS &
    LITE-ON DIGITAL SOLUTIONS USA, INC.,
21
                  Defendants.
22

23

24          Plaintiff Alec Berezin ("Plaintiff"), individually and on behalf of a Class of all

25  others similarly situated, brings this action for damages and injunctive relief under the antitrust

26  laws of the United States against Defendants, and alleges on information and belief as follows:

27

28

848729.4                              - 1 -                  CLASS ACTION COMPLAINT
                                                             CASE NO. _____

## I.    **INTRODUCTION**

1.     Plaintiff brings this antitrust class action on behalf of persons and entities who directly purchased an Optical Disc Drive ("ODD") product in the United States from the named Defendants, any subsidiaries or affiliates thereof, or any agents or co conspirators, during the period from at least January 1, 2004 through the present (the "Class Period").

2.     As used herein, the term "ODD products" means ODDs and products that contain ODDs.

3.     As explained in further detail below, ODDs retrieve and store data on compact discs, DVDs and Blu-ray discs. ODDs are standard issue on most computers and are a major component in consumer products, including CD players and video game systems.

4.     ODD production requires a significant level of capital expenditure. Production costs create a high barrier to entry in the market for ODDs. This and other conditions in the ODD industry enabled the price-fixing conspiracy detailed in this Complaint. In particular, these conditions fostered market consolidation through joint ventures, mergers, and alliances enabling Defendants to engage in discussions about prices to be charged for ODD products.

5.     During the Class Period, Defendants participated in cartel behavior to fix the prices of these products.

6.     Throughout the Class Period, defendants' conspiracy was effective in moderating the normal downward pressures on prices for ODD products caused by periods of oversupply and technological change. Defendants' conspiracy resulted in unusually long periods of high prices and high profits. Although there were periods when prices for ODD products temporarily declined as a result of new entrants being assimilated, or breakdowns in the effectiveness of the conspiracy, those price declines were from levels that had been set conspiratorially high, rather than from levels set by free and open competition. In addition, prices declined less than they would have in a competitive market. As a result of defendants' unlawful conduct, Plaintiff and members of the Class paid higher prices for ODD products than they would have paid in a competitive market.

7.     Because of Defendants' unlawful conduct and conspiracy, Plaintiff and other members of the Class paid higher prices for ODD products than they would have paid in a competitive market.  Plaintiff and other members of the Class who purchased these products have been damaged by Defendants' illegal actions.

## II.   JURISDICTION AND VENUE

8.     Plaintiff brings this action to obtain injunctive relief and to recover damages, including treble damages, cost of suit, and reasonable attorneys' fees arising from Defendants' violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

9.     This Court has subject matter jurisdiction pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15) and 28 U.S.C. §§ 1331 and 1337.

10.     Venue is proper in this judicial district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, a substantial portion of the affected interstate trade and commerce described below was carried out in this district, and one or more of the Defendants resides in this district.

11.     Defendants are subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their contacts with the State of California.

## III.   PARTIES

### A.   The Plaintiff

12.     Plaintiff Alec Berezin resides in Highland Heights, Ohio.  During the Class Period, plaintiff purchased an ODD product directly from one or more Defendants and suffered injury as a result of Defendants' unlawful conduct.

### B.   Defendants

13.     Defendant Hitachi Ltd. ("Hitachi") is a business entity organized under the laws of Japan, with its principal place of business at 6-1 Marunouchi Center Building 13F Chiyoda-ku, Tokyo, 100-8220, Japan.  During the Class Period, Hitachi manufactured, sold, and distributed ODD products to customers throughout the United States.

14.     Defendant LG Electronics, Inc. ("LG") is a business entity organized under the laws of Korea, with its principal place of business at LG Twin Towers 20, Yoido-dong, Youngdungpo-gu Seoul, 150-721, Korea. During the Class Period, LG manufactured, sold, and distributed ODD products to customers throughout the United States.

15.     Defendant Hitachi-LG Data Storage, Inc. ("Hitachi-LG") is a business entity organized under the laws of Japan with its principal place of business located at 4F MSC Center Building, 22-23 Kaigan 3-Chrome, Tokyo, Japan. Hitachi-LG, established in November 2000, is a joint venture of Hitachi and LG. Hitachi-LG specializes in designing and developing optical storage drives and selling them worldwide to original equipment manufacturers ("OEM"). During the Class Period, Hitachi-LG manufactured, sold, and distributed ODD products to customers throughout the United States.

16.     Defendant Koninklijke Philips Electronics N.V. ("Philips") is a business entity organized under the laws of The Netherlands, with its principal place of business at High Tech Campus 5, 5656 AE Eindhoven, The Netherlands. During the Class Period, Philips manufactured, sold, and distributed ODD products to customers throughout the United States.

17.     Defendant Lite-On IT Corp. of Taiwan ("Lite-On") is a business entity organized under the laws of Taiwan with its principal place of business located at 12F, 392, Ruey Kuang Road, Neihu, Taipei 114, Taiwan, R.O.C. During the Class Period, Lite-On manufactured, sold, and distributed ODD products to customers throughout the United States.

18.     Defendant Philips & Lite-On Digital Solutions Corp. ("Philips & Lite-On") is a business entity organized under the laws of Taiwan, with its principal place of business located at 16F, 392, Ruey Kuang Road, Neihu, Taipei, 114, Taiwan, R.O.C. Philips & Lite-On, established in March 2007, is a joint venture company of Philips and Lite-On. Philips & Lite-On's operations include: design, development, sales, marketing, customer support, and service of ODD products. During the Class Period, Philips & Lite-On manufactured, sold, and distributed ODD products to customers throughout the United States.

19.     Defendant Philips & Lite-On Digital Solutions USA, Inc. ("Philips & Lite-On USA") is a business entity organized under the laws of Delaware, with its principal place of

848729.4

- 4 -

CLASS ACTION COMPLAINT
CASE NO. _____

1   business located at 42000 Christy Street, Fremont, California 94538. Philips & Lite-On USA, Inc

2   is a subsidiary of Philips & Lite-On. Philips & Lite-On USA serves customers in the Northern &

3   Latin American regions. During the Class Period, Philips & Lite-On USA manufactured, sold,

4   and distributed ODD products to customers throughout the United States.

5           20.    Defendant Sharp Corporation ("Sharp") is a business entity organized

6   under the laws of Japan, with its principal place of business at 22-22 Nagaike-cho, Abeno-ku,

7   Osaka 545-8522, Japan. During the Class Period, Sharp manufactured, sold, and distributed

8   ODD products to customers throughout the United States.

9           21.    Defendant Sony Corp. ("Sony") is a business entity organized under the

10   laws of Japan, with its principal place of business located at 1-7-1 Konan, Minato-ku, Tokyo 108-

11   0075, Japan. In 2000, Sony established a subsidiary named Sony Electronics e-Solutions Co.

12   LLC, which sold ODDs throughout the United States. In 2006, Sony and NEC formed the joint

13   venture Sony Optiarc Inc. During the Class Period, Sony manufactured, sold, and distributed

14   ODD products to customers throughout the United States.

15           22.    Defendant NEC Corporation ("NEC") is a business entity organized under

16   the laws of Japan with its principal place of business located at 7-1, Shiba 5-chome, Minato-ku,

17   Tokyo 108-8001, Japan. During the Class Period, NEC manufactured, sold, and distributed ODD

18   products to customers throughout the United States.

19           23.    Defendant Sony Optiarc Inc. is a business entity organized under the laws

20   of Japan with its principal place of business located at 4-16-1 Okata, Atsugi-shi, Kanagawa, 243-

21   0021 Japan. Sony Optiarc Inc. was established in April 2006 as a joint venture between Sony and

22   NEC. In 2008, Sony bought NEC's interest in Sony Optiarc Inc., which became a wholly-owned

23   subsidiary of Sony in December 2008. Sony Optiarc Inc. is engaged in the development, design,

24   manufacturing, marketing, and sales of ODD products. During the Class Period, Sony Optiarc

25   Inc. manufactured, sold, and distributed ODD products to customers throughout the United

26   States.

27           24.    Defendant Sony Optiarc America Inc. is a business entity organized under

28   the laws of Delaware with its principal place of business located at 1730 N. First Street, San Jose,

1  California 95112. Sony Optiarc America Inc. is a wholly-owned subsidiary of Sony Optiarc Inc.

2  focused on the North and Latin American markets for ODDs. During the Class Period, Sony

3  Optiarc America Inc. manufactured, sold, and distributed ODD products to customers throughout

4  the United States.

5          25.    Defendant Toshiba Corporation ("Toshiba") is a business entity organized

6  under the laws of Japan, with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku,

7  Tokyo 105-8001, Japan. During the Class Period, Toshiba manufactured, sold, and distributed

8  ODD products to customers throughout the United States.

9          26.    Defendant Samsung Electronics Co. Ltd. ("Samsung") is a business entity

10  organized under the laws of South Korea, with its principal place of business at Samsung Main

11  Building 250-2 ga, Taepyung-ro Chung-gu, Seoul, Korea. During the Class Period, Samsung

12  manufactured, sold, and distributed ODD products to customers throughout the United States.

13          27.    Defendant Toshiba Samsung Storage Technology Corp. ("TSST") is a

14  business entity organized under the laws of Japan with its principal place of business located at 1-

15  1, Shibaura 1-Chome, Minato-ku, Tokyo 105-8001, Japan. TSST, established in April 2004, is a

16  joint venture company of Toshiba and Samsung. During the Class Period, TSST manufactured,

17  sold, and distributed ODD products to customers throughout the United States.

18  **IV.   AGENTS AND CO-CONSPIRATORS**

19          28.    The acts alleged against the Defendants in this Complaint were authorized,

20  ordered, or done by their officers, agents, employees, or representatives, while actively engaged

21  in the management and operation of defendants' businesses or affairs.

22          29.    Each Defendant acted as the principal, agent, or joint venturer of, or for,

23  other Defendants with respect to the acts, violations, and common course of conduct alleged by

24  Plaintiff.

25          30.    Various persons and/or firms not named as Defendants in this Complaint

26  participated as co-conspirators in the violations alleged herein and may have performed acts and

27  made statements in furtherance thereof.

28

31.     When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.  As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.  Furthermore, to the extent that subsidiaries within the corporate families distributed ODD products to direct purchasers, these subsidiaries played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct purchasers would not undercut the pricing agreements reached at these various meetings.  Thus, all entities within the corporate families were active, knowing participants in the alleged conspiracy.

## V.     CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action individually and on behalf of the following Class pursuant Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure:

> All persons and entities residing in the United States who, from at least January 1, 2004 through the present, purchased an ODD product in the United States directly from the Defendants or their co-conspirators.  Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant.  Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

33.     This action has been brought and may be properly maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

a.      The Class is ascertainable and there is a well-defined community of interest among the members of the Class;

b.    Based upon the nature of the trade and commerce involved and the number of direct purchasers of ODD products, Plaintiff believes that the members of the Class number in the thousands, and therefore is sufficiently numerous that joinder of all Class members is not practicable;

c.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff directly purchased ODD products from one or more of the Defendants or their co-conspirators, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class;

d.    The following common questions of law or fact, among others, exist as to the members of the Class:

i.    the identities of the co-conspirators;

ii.    whether Defendants formed and operated a combination or conspiracy to fix, raise, maintain or stabilize the prices of, or allocate the market for, ODD products;

iii.    the nature and character of the acts done in furtherance of the conspiracy;

iv.    whether the combination or conspiracy caused ODD products prices to be higher than they would have been in the absence of Defendants' conduct;

v.    the duration of Defendants' combination or conspiracy;

vi.    whether Defendants' conduct caused injury to the business or property of Plaintiff and the members of the Class;

vii.    the appropriate measure of the amount of damages suffered by the Class;

viii.   whether Defendants' conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1; and

ix.   whether Defendants actively concealed the conspiracy from Plaintiffs and other Class members.

e.   These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class;

f.   After determination of the predominate common issues identified above, if necessary or appropriate, the Class can be divided into logical and manageable subclasses;

g.   Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff has no interests that are antagonistic to other members of the Class and has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent herself and the Class;

h.   A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all damaged Class members is impractical. The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent the availability of class action procedures, it would not be feasible for Class members to redress the wrongs done to them. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary

848729.4

- 9 -

CLASS ACTION COMPLAINT
CASE NO. _____

1        adjudication, economies of scale and comprehensive supervision by

2        a single court;

3     i.   Defendants have acted, and refused to act, on grounds generally

4        applicable to the Class, thereby making appropriate final injunctive

5        relief with respect to the Class as a whole; and

6     j.   In the absence of a class action, Defendants would be unjustly

7        enriched because they would be able to retain the benefits and fruits

8        of their wrongful conduct.

9  **VI.   TRADE AND COMMERCE**

10        34.    Throughout the Class Period, Defendants and their co-conspirators engaged

11  in the business of marketing and selling ODD products throughout the United States.

12        35.    During the Class Period, each Defendant, or one or more of its subsidiaries,

13  sold ODD products in the United States in a continuous and uninterrupted flow of interstate

14  commerce and foreign commerce, including through and into this judicial district.

15        36.    During the Class Period, Defendants collectively controlled a vast majority

16  of the market for ODD products, both globally and in the United States.

17        37.    The business activities of the Defendants substantially affected interstate

18  trade and commerce in the United States and caused antitrust injury in the United States.

19        38.    Defendants sell their ODD products through various channels including to

20  manufacturers of electronic products and devices, and to resellers of ODD products. These

21  electronic products and devices and ODD products are then sold, directly or indirectly, to

22  consumers and are not altered during the course of sale.

23        39.    California is the worldwide center of the PC industry and other industries

24  that depend upon the ODD products market. Statements concerning the prices and market

25  conditions for ODD products were disseminated by Defendants from and into California on a

26  regular and continuous basis.

27

28

848729.4

VII.   **FACTUAL ALLEGATIONS**

40.   Defendants, through their officers, directors and employees, entered into the contract, combination, trust and conspiracy among themselves and their co-conspirators by, among other things:

      a.   participating in meetings and conversations, including through various trade associations and committees, to discuss the prices of ODD products in the United States;

      b.   agreeing, during those meetings and conversations, to charge prices at specified levels and otherwise to increase and maintain prices of ODD products sold in the United States;

      c.   issuing price announcements and quotations in accordance with the agreements reached; and

      d.   selling ODD products to various customers in the United States at non-competitive prices.

A.   **ODD Technology**

41.   An ODD reads or writes data on discs, such as compact discs (CDs), DVDs and Blu-ray discs.

42.   ODDs use a laser light or electromagnetic waves to burn impressions onto and read impressions on CDs, DVDs and Blu-ray discs.

43.   ODDs are an integral part in everyday consumer products, such as CD, DVD and Blu-Ray disc players. Today, most computers have ODDs for reading software and storing data.

44.   The earliest ODDs, known as CD-ROM and DVD-ROM drives, could only read data from discs. Later versions could read from and write or "burn" data on to a disc permanently—these are known as CD-R and DVD-R recorders. Newer drives such as CD-RW and DVD-RW drives can read from, write and even "rewrite" onto the same disc. The latest drives can read from, write, and rewrite onto all kinds of optical Discs—these are known as "super multi-drives."



45.     The current ODD industry features drives that come in two sizes: half-height ODDs and slim ODDs.  Slim ODDs are a relatively new size in the ODD market, and are used primarily in notebook applications.  They make up a small percentage of the overall ODD industry.  For example, slim ODDs accounted for 8.7 percent of the ODD market in Taiwan in Q1 2004.  A majority of slim ODDs during this time were combo drives.

46.     In the early part of this decade, the slim combo drive market was dominated by two Japanese producers, Toshiba and KME.   However, over time, Taiwanese makers entered into the market and gained share in the global market.

**B.     Structure of the ODD Industry**

47.     The market for the manufacture and sale of ODD products is conducive to the type of collusive activity alleged here.  The ODD products industry has several characteristics that facilitated a conspiracy, including market concentration, information sharing, the consolidation of manufacturers, significant barriers to entry, a history of anticompetitive conduct, and the standardized nature of ODD products.

1.    **Market Concentration**

48.    The market for ODD products is large.  The global market for ODDs in 2005 was approximately $9.23 billion and approximately 303.8 million units were shipped.  For example, Hitachi-LG Data Storage reported $2.4 billion in revenue in 2005, the last year for which figures are available, and Sony Optiarc Inc. reported $1.52 billion in sales for the year that ended March 2008.  According to some market estimates, the ODD industry currently generates yearly worldwide revenues in excess of $8 billion.

49.    Despite its large size, the ODD industry is highly concentrated, a factor that is conducive to the type of collusive activity alleged by plaintiffs.

50.    The ODD industry has an estimated Herfindahl-Hirschman Index (HHI), the most common measure of industry concentration, of 1,960.  The DOJ typically considers an industry "highly concentrated" if it has a HHI greater than 1,800.

51.    A few large firms dominate ODD sales globally.  In the first quarter of 2006, three firms (Hitachi, Lite-On, and Toshiba) controlled 54 percent of global sales, and five firms (Hitachi, Lite-On, Toshiba, Ben-Q, and Panasonic) controlled 81 percent.



Worldwide BD, DVD, and CD Drive Shipment Share by Vendor, 2005-2008

Source: IDC, 2009

848729.4

- 13 -

52.     Market concentration increased throughout 2006, when Sony and NEC embarked on a joint venture and Lite-On acquired Ben-Q's ODD factories.

53.     In 2008, four firms, Hitachi-LG, TSST, Sony Optiarc, and Lite-On, accounted for 81 percent of the ODD products market.

## 2.     ODD Products Are Commodities

54.     The quality of the ODD products in question do not vary significantly. For example, the speed race is basically over for DVD drives at 20x to 24x. If there were competition in the industry—especially for DVD burners—it would be based solely on price.

55.     Defendants recognize that their ODD products were commodities, and that price is the determinative factor in their customers' purchasing decisions. This fact influenced defendants' decision-making and provided economic incentives to eliminate competition and collude on price. For example, in 2008 the demand for Blu-Ray ODDs for use in personal computers increased. But Defendants recognized a large gap in asking price between themselves and the major PC manufacturers. Rather than risk a price war, Defendants, including HLDS, TSST, and Lite-On IT, collectively refrained from accepting orders until the fourth quarter of 2008. "Taiwanese, Korean and Japanese big ODD makers, such as HLDS, TSST, Pioneer and Lite-On IT do not want to be caught up in whirlinds of price wars. According to the product planning timetables of major PC brands, price wars in the Blu-Ray disc drive industry are expected to begin in the fourth quarter of 2008." *See* Jinchi Hsu, *Disagreement on OEM Prices, PC Makers Suspend Blu-ray Offering: HLDS, TSST, Pioneer and Lite-On IT Do Not Cut Prices,* DIGITIMES Inc. Taiwan, Sept. 23, 2008, *available at* http://www.digitimes.com.tw/tw ("台韓日系大廠如日立樂金(HLDS)、東芝三星(TSST )、先鋒(Pioneer)與建興電子等均不願陷入殺價的漩渦。根據各大PC品牌產品規劃時程，藍光光碟機戰火預計將從2008年第4季開始引燃 . . .").

## 3.     Standardized Product

56.     A product is considered standardized across suppliers when there is a high degree of substitutability among different suppliers in the market. When products are viewed as

1    interchangeable by purchasers, it is easier to agree on price and to effectively monitor those

2    agreements. This makes it easier to form and sustain a cartel.

3           57.    In 1997, the Optical Storage Technology Association ("OSTA") developed

4    "MultiRead," which was an industry consensus aimed at defining the parameters and

5    specifications necessary for all classes of optical discs to be able to be read on current and future

6    ODDs. On March 7, 2000, OSTA announced that seventeen ODD manufacturers, representing

7    well over 90 percent of the ODD market at the time, achieved compliance with its MultiRead

8    specification. Those seventeen manufacturers included Defendants Hitachi, LG, Lite-On, Philips,

9    Samsung, Sony, and Toshiba.

10          58.    The ODD industry is also characterized by patents and intellectual property

11   rights which require adoption of standardized product specifications. As stated by Philips

12   Consumer Electronics B.V., which is responsible for the development of CD technology and

13   continues to hold patents and licensing rights arising therefrom:

14          Standardization offers many other advantages to industry as a
            whole. For example: [1] Improvements to performance,
15          compatibility, reliability, safety and interoperability; [2] Economies
            of scale and lower costs—for example, by allowing manufacturers
16          to address multiple regions with a single product or manufacturing
            line; and [3] *Cooperation between industry leaders, reducing the*
17          *risk for 'first-mover' companies which pioneer new products or*
            *technologies.* (Emphasis added)
18

      **4.    Information Sharing**
19
            59.    Because of common membership in trade associations, interrelated
20
     business arrangements such as joint ventures, allegiances between companies in certain countries,
21
     and relationships between the executives of certain companies, there were many opportunities for
22
     Defendants to discuss and exchange competitive information.
23
            **a.    Optical Storage Technology Association ("OSTA")**
24
            60.    For example, in 1992, the Optical Storage Technology Association
25
     ("OSTA") incorporated "to promote the use of recordable optical technologies and products."
26
     OSTA's membership includes ODD manufacturers such as Sony and LG. OSTA works to "shape
27
     the future of the industry" through regularly scheduled meetings covering a variety of industry
28

848729.4                              - 15 -                    CLASS ACTION COMPLAINT
                                                               CASE NO. _____

1  topics and an annual Optical Storage Symposium. Benefits of OSTA membership for all

2  members, as listed on its website, include:

3      • Influenc[ing] the health and direction of the industry.
       • Meet[ing] with industry peers for information exchange.
4      • Receiv[ing] early foresight into industry strategies.

5  Optical Storage Technology Association, "OSTA Membership Benefits,"

6  http://www.osta.org/membership/pdf/benefits.pdf (last visited April 8, 2010).

7          61.    In addition to providing a variety of benefits to members, OSTA also plays

8  an important role in the industry through its efforts to establish industry-wide specifications for

9  optical disc and ODD technologies including MultiRead (as described below), MultiPlay, and

10 Universal Disk Format.

11              **b.    DVD Forum**

12         62.    Defendants Hitachi, LG, Lite-On, NEC, Philips, Samsung, Sony, and

13 Toshiba are also members of the DVD Forum, a global association formed in 1997 to promote

14 and improve standards for the DVD format and products associated with that format. The stated

15 purpose of the DVD Forum is "to exchange and disseminate ideas and information about the

16 DVD Format and its technical capabilities, improvements and innovations."

17              **c.    Recordable DVD Council**

18         63.    Defendants Hitachi, Samsung and Toshiba were among eight executive

19 members of the Recordable DVD Council, which formed in April 2001. Explained Mr. Bon-Guk

20 Koo, chairman of the Council, as well as Senior Corporate Advisor and former Executive Vice

21 President of Samsung, "The Council will make its chief targets industry outreach at major trade

22 shows, *information exchanges among Council members* and discussions aimed at expanding the

23 recordable DVD market."

24              **d.    Blu-ray Disc Association**

25         64.    Defendants Hitachi, LG, NEC, Philips, Samsung, Sony, Toshiba are also

26 members of the Blu-ray Disc Association, a worldwide group formed in 2005 to promote the Blu-

27 ray Disc format and products associated with that format. Sony, LG, Hitachi, and Samsung all

28 participated in the first meeting of Blu-ray Disc patent owners in Los Angeles, California on

July 6-7, 2006. The stated purpose of the event was to create joint licensing agreements amongst the participating optical disk drive manufacturers.

### 5. Multiple Interrelated Business Relationships

65. The ODD industry experienced significant consolidation during the Class Period. As manufacturing drifted towards lower-cost drive makers in Korea and Taiwan between 2001 and 2003, early Japanese makers still held key competitive advantages – intellectual property rights. To mitigate the high cost of royalty payments for licensing this intellectual property, Taiwanese and Korean Defendants partnered with the patent holders through strategic alliances and joint ventures. These alliances include:

a.   Hitachi-LG joint venture, formed on November 1, 2000 in Tokyo, Japan;

b.   JVC Lite-On IT Manufacturing & Sales Ltd. (JLMS), a production and marketing company founded in October 2001 in Hong Kong;

c.   Philips BenQ Digital Storage (PBDS), founded February 2003 and specializing in the manufacture of DVD+RW ODDs;

d.   Sony & Lite-On IT alliance, memorandum of understanding signed in February 2003;

e.   Toshiba-Samsung (TSST) joint venture, established in April 2004;

f.   Sony NEC Optiarc joint venture, formed in 2006, followed by NEC's transfer of its Sony NEC Optiarc Inc. stock to Sony in September 2008;

g.   Lite-On acquisition of BenQ in 2006, by which Lite-On obtained a 27 percent share in global ODD production; and

h.   Philips & Lite-On, formed in March 2007;

i.   Pioneer Digital Design and Manufacturing Corporation, joint venture between Sharp and Pioneer Corp. formed in November 2009 to establish a joint venture named that "will develop, design,

1  manufacture and sell optical-disk products such as optical disk

2  drives, recorders and players."

3      66.    The mutually beneficial nature of the business relations between certain

4  Defendants provided the opportunity to conspire and created a financial incentive to do so. As

5  one Sony spokesman explained when announcing the formation of Sony Optiarc, the joint venture

6  was formed because "[t]here was a feeling that those two complementary strengths [of Sony and

7  NEC] would make more sense in a joint venture than competing against each other."

8      67.    Similarly, after the formation of Philips & Lite-On Digital Solutions, the

9  company's general manager, Tseng Huan-Xiong, said that the two joint venture partners were

10  looking forward to pursuing profits without getting caught up in the "whirlwinds of price

11  competition." *See* "PLDS Sets Pursuit of Profits as Goal, and Challenges Itself To Be the

12  Second Largest Optical Storage Producer in 2007," June 29, 2007.

13      **6.**    **High Costs of Entry Into the Industry**

14      68.    The market for the manufacture and sale of ODD products is subject to

15  high manufacturing and technological barriers to entry. Efficient manufacturing plants are large

16  and costly. Companies, such as Defendants, that develop and manufacture ODD products face

17  technological advances, causing the companies to undertake significant research and development

18  expenses. For example, from 2002 to 2005, a time in which all or most of its sales came from

19  ODDs, Lite-On IT spent approximately $79.7 million in research and development.

20      69.    ODD manufacturers' strong relationships with patent holders for

21  component technology create another barrier to entry in the ODD market. This is especially

22  notable in the PC market. Establishing these important relationships with patent holders is

23  difficult for low-volume manufacturers of ODDs, and therefore, makes it difficult for them to

24  compete effectively in the market.

25      70.    Another important barrier to entry is the difficulty in landing sizeable OEM

26  orders, which make up the majority of ODD transactions. End-product OEMs usually require a

27  lengthy qualification process before entering into supply agreements. An analyst in 2003 noted

28  that "local competition remains slow because of entry barriers . . . PC OEMs, in our view, may

1    retain two-three suppliers from Taiwan, Japan and Korea on the list as a strategy to diversify

2    country risk, which suggests a smaller pie to divide up among late entrants."

3                    7.    **History of Collusion**

4           71.    Many of the key players in the ODD industry are known antitrust violators.

5    For example, several of the Defendants named herein have been implicated in a worldwide price

6    fixing conspiracy for thin film transistor liquid crystal displays ("TFT-LCD") in *In re TFT-LCD*

7    *(Flat Panel) Antitrust Litig.*, N.D. Cal., Case No. 07-1827 (MDL No. 1827).

8           72.    On December 15, 2008, LG Display, a subsidiary of Defendant LG, plead

9    guilty and agreed to pay a $400 million fine for their participation in a conspiracy from

10   September 2001 to June 2006 to fix the price of TFT-LCD panels sold in the United States.

11          73.    On December 16, 2008, Defendant Sharp pled guilty to participation in

12   conspiracies to fix the price of TFT-LCD panels, and was fined $120 million fine for its conduct.

13          74.    On May 22, 2009, a subsidiary of Defendant Hitachi also pled guilty to

14   TFT-LCD conspiracy charges and agreed to pay a $31 million fine.

15          75.    Defendant Toshiba is also under investigation by the DOJ for fixing prices

16   of TFT-LCD panels.

17          76.    Defendants NEC and Samsung are also defendants in the *In re DRAM*

18   *Antitrust Litigation*, N.D. Cal., Case No. 02-cv-1486.  The DOJ fined Defendant Samsung $300

19   million in October 2005 for participating in a conspiracy to fix prices for Dynamic Random

20   Access Memory ("DRAM").

21          77.    Defendants Samsung, LG Electronics, and Toshiba are also defendants in

22   the *In re Cathode Ray Tube (CRT) Antitrust Litig.*, N.D. Cal., Case No. 07-5944 (MDL

23   No. 1917).  On October 7, 2009 in a cease and desist order, The Japan Fair Trade Commission

24   levied $37.4 million in fines against five companies, including LG Philips Displays Korea Co.

25   and an arm of South Korea's Samsung group and their affiliates for alleged participation in a

26   price-fixing cartel for cathode ray tubes.

27          78.    Defendants Hitachi, Samsung and Toshiba are also defendants in the *In re*

28   *Flash Memory Antitrust Litigation*, N.D. Cal., Case No. 07-cv-0086.

848729.4                              - 19 -                    CLASS ACTION COMPLAINT
                                                               CASE NO. _____

1        79.    Defendants Hitachi, NEC, Samsung, Sony, and Toshiba are also defendants

2   in the *In re SRAM Antitrust Litigation*, N.D. Cal., Case No. 07-cv-1819 (MDL No. 1819).

3        80.    In October 2009, it was announced that Sony and Philips were fined by the

4   foreign antitrust enforcement agency, the Taiwan Fair Trade Commission, for their

5   anticompetitive business practices in connection with the licensing of the technology for CD-Rs,

6   discs that are used in ODDs.

7   **C.    International Government Antitrust Investigations**

8        81.    Defendants' conspiracy to fix the prices of ODD products sold in the

9   United States during the Class Period is demonstrated by a multinational investigation

10  commenced by the United States Department of Justice ("DOJ") and others in 2009.

11       82.    On October 27, 2009, the Wall Street Journal reported, "[t]he Justice

12  Department started a criminal antitrust probe into the market for ODDs in recent months,

13  investigating disc-drive makers for possible price-fixing, bid-rigging and allocation of markets,

14  according to a person familiar with the investigation."

15       83.    On October 27, 2009, Reuters reported that a spokeswoman from the DOJ,

16  Gina Talamona, confirmed that the antitrust division is investigating possible violations of

17  antitrust law in the ODD industry.

18       84.    On October 23, 2009, Defendant Sony, in its Form 6-K filed with the SEC,

19  stated:

> Sony Corporation said today that its U.S. subsidiary, Sony Optiarc
> America Inc., has received a subpoena from the U.S. Department of
> Justice (DOJ) Antitrust Division seeking information about its
> ODD business. Sony understands that the DOJ and agencies outside
> the United States are investigating competition in ODDs.

23  On October 27, 2009, the Wall Street Journal reported that Defendant Sony Corporation received

24  a subpoena "about its U.S. optical disk drive business."

25       85.    On or around October 27, 2009, Defendant Hitachi admitted that both it

26  and its joint venture Hitachi-LG Data Storage ("HLDS") are under antitrust investigation for

27  anticompetitive practices in the ODD market by the DOJ, the European Commission, and the

28  Competition Commission of Singapore.

848729.4                     - 20 -                     CLASS ACTION COMPLAINT
                                                        CASE NO. _____

86.     On or around October 27, 2009, Defendant Toshiba acknowledged that Toshiba Samsung Storage Technology Corp. ("TSST") received subpoena from DOJ and other government authorities. It also acknowledged that TSST is the subject of investigations by other governments' authorities.

87.     In its 2009 annual report, Philips revealed that Philips and Philips & Lite-On Digital Solutions Corporation were also the subject of international investigations into anticompetitive conduct in the ODD Products market:

> On October 27, 2009, the Antitrust Division of the United States Department of Justice confirmed that it had initiated an investigation into possible anticompetitive practices in the Optical Disc Drive (ODD) industry. Philips Lite-On Digital Solutions Corp. (PLDS), a joint venture owned by the Company and Lite-On IT Corporation, as an ODD market participant, is included in this investigation. PLDS is also subject to similar investigations outside the US relating to the ODD market. PLDS and Philips intend to cooperate with the authorities in these investigations.

88.     In a related Freedom of Information Act case, the DOJ admitted that "a DOJ spokesperson acknowledged that DOJ commenced an investigation into possible violations of antitrust law in the optical disc drive industry." *Lieff, Cabraser, Heimann & Bernstein LLP v. United States Department of Justice. Antitrust Division*, N.D.Cal. No. 10-cv-0013-VRW , Defendant's Answer to Plaintiff's Complaint for Relief (Doc #8 at 2), ¶6.

**D.      Economic Data on Pricing and Supply**

89.     ODD pricing during the Class Period has not behaved as would be expected in a competitive market.

90.     After introduction into a market, consumer electronics products and their component parts are typically characterized by downward pricing trends. However, the ODD market has been characterized by unnatural price stability and certain periods of upward pricing trends.

91.     The cost of manufacturing ODDs should have declined as the industry consolidation and manufacturing bases shifted to lower-cost countries. However, according to

1   U.S. Bureau of Labor Statistics, around the beginning of 2004 prices for computer storage

2   devices, which includes ODDs, started to level off.



**Producer Price Index for Computer Storage Device Manufacturing
Jan. 1999-May 2009**

Source: U.S. Bureau of Labor Statistics
Producer Price Index for Exports 334112334112: Computer Storage Device Manufacturing
Note: Includes devices that allow the storage and retrieval of data from a phase change, magnetic, optical, or magnetic/optical media.

15          92.     According to industry sources, firms increasingly attempted to stabilize

16   pricing and avoid continued decreases in pricing and, presumably, profit margins.

17          93.     Changes in demand for ODDs are also unlikely to explain the unnatural

18   price stabilization during the Class Period.  For example, ODD prices remained relatively stable

19   between 2004 and 2006 despite a drop in sales of DVD players.

### DVD HARDWARE SALES IN U.S.

| Q | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1Q | .030 | .094 | .358 | 1.350 | 2.220 | 3.565 | 4.858 | 6.855 | 7.741 | 7.852 | 8.350 | 6.01 | 5.80 |
| 2Q | .079 | .149 | .611 | 1.435 | 2.404 | 3.750 | 5.506 | 6.057 | 6.006 | 6.676 | 6.396 | 4.98 | 4.60 |
| 3Q | .077 | .244 | .880 | 1.550 | 2.537 | 4.740 | 6.470 | 6.593 | 6.250 | 6.831 | 6.139 | 5.39 | 4.60 |
| 4Q | .119 | .459 | 1.701 | 5.542 | 9.501 | 13.058 | 16.900 | 17.621 | 14.343 | 12.512 | 12.633 | 8.85 | 7.80 |
| YEARLY TOTAL | .305 | .946 | 3.550 | 9.877 | 16.662 | 25.113 | 33.734 | 37.126 | 34.340 | 33.871 | 33.518 | 25.23 | 22.80 |
| TOTAL (since launch) | | | | | | | | | | | | | 277.072 |

Includes set-top and portable DVD players, Home-Theater-In-a-Box systems, TV/DVD and DVD/VCR combination players.

DEG:  The Digital Entertainment Group.

94.     Unnatural price stabilization and increases occurred in the face of reductions in the cost of producing ODD products.  During the Class Period, the cost of ODD primary components continued to decline, yet the rate of decline for prices did not follow.



**YoY Growth of Optical Disk Storages Price Index**
2005 through 2009

Source: Bank of Japan

## VIII.  FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

95.     Throughout and beyond the conspiracy, Defendants and their co-conspirators affirmatively and actively concealed their unlawful conduct from Plaintiff. Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives.  Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases.  Defendants and their co-conspirators concealed the true nature of their unlawful conduct, and acts in furtherance thereof, through various means and methods to avoid detection.  Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws as alleged herein until shortly before this class action litigation was commenced.

96.     One commonly cited reason that Defendants publicly stated for the increased or stabilized prices of ODDs is an ostensible shortage of "pick-up heads," a component of ODDs.  For example, after Lite-On IT raised its OEM price quotation for half-height (H/H) combo drives by 3%-5% to $35-40 per drive, the general manager of Lite-On's optical disc drive

1   business unit, Michael Gong, stated that this price increase was caused at least in part by a

2   shortage of pick-up heads.  In fact, the major global suppliers of pick-up heads include several of

3   the Defendants themselves, including Hitachi, Sony, and Sharp.

4           97.    As a result of the active concealment of the conspiracy by Defendants and

5   their co-conspirators, any and all applicable statutes of limitations otherwise applicable to the

6   allegations herein have been tolled.

7   **IX.    CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1**

8           98.    Plaintiff incorporates by reference all of the above allegations as if fully set

9   forth herein.

10          99.    Beginning at least as early as January 1, 2004 and continuing through

11  present, the exact dates being unknown to Plaintiff, Defendants and various co-conspirators

12  entered into and engaged in a continuing agreement, contract, combination, and conspiracy to fix,

13  raise, maintain, or stabilize the price for ODD products in unreasonable restraint of interstate and

14  international trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

15         100.    For the purpose of forming and implementing the alleged combinations,

16  trusts, agreements, understandings and concert of action, Defendants and their co-conspirators did

17  those things they conspired to do, including but not limited to the acts alleged above, including

18  actions:

19          a.    to fix, raise, maintain and stabilize the price of ODD products;

20          b.    to allocate markets for ODD products amongst themselves;

21          c.    to submit rigged bids for the award and performance of certain

22                  ODD products contracts; and

23          d.    to allocate amongst themselves the production of ODD products.

24         101.    Defendants have participated in one or more overt acts in furtherance of the

25  conspiracy alleged above, and have participated in the conspiratorial activities described above.

26         102.    The combination and conspiracy alleged herein has had the following

27  effects, among others:

28

a.  Price competition in the sale of ODD products has been restrained, suppressed and/or eliminated throughout the United States;

b.  Prices for ODD products sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

c.  Plaintiff and members of the Class have been deprived of the benefit of free and open competition.

103.  As a direct and proximate result of the illegal combination, trust, agreement, understanding and concert of action, Plaintiff and the members of the Class have been injured in their business and property in that they paid more for ODD products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## X.  PRAYER FOR RELIEF

1.  That the Court determine that the claim alleged herein under the Sherman Act, 15 U.S.C. § 1, may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

2.  That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

3.  That Plaintiff and the Class recover damages, as provided law, and that a joint and several judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled in accordance with applicable laws;

4.  That Plaintiff and members of the Class be awarded pre- and post-judgment interest, and that that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

5.  That Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

CLASS ACTION COMPLAINT
CASE NO _____

6.     That Plaintiff and members of the Class receive an award for such other and further relief as the nature of the case may require or as the Court deems just, equitable, and proper.

## XI.     JURY TRIAL DEMANDED

Plaintiff demands a trial by jury for all issues so triable.

Dated: April 9, 2010                    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

By: _____
                                                    Eric B. Fastiff

Joseph R. Saveri (State Bar No. 130064)
Eric B. Fastiff (State Bar No. 182260)
Brendan P. Glackin (State Bar No. 199643)
Andrew S. Kingsdale (State Bar No. 255669)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
jsaveri@lchb.com
efastiff@lchb.com
bglackin@lchb.com
akingsdale@lchb.com

Steven J. Greenfogel
Daniel B. Allanoff
MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C.
1521 Locust Street, 8th Floor
Philadelphia, PA 19102
sgreenfogel@mcgslaw.com
dallanoff@mcgslaw.com

Vincent J. Esades
HEINS, MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
vesades@heinsmills.com

Daniel R. Karon
GOLDMAN SCARLATO & KARON, P.C.
55 Public Square, Suite 1500
Cleveland, OH 44113
karon@gsk-law.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Joseph Gentile
SARRAF GENTILE LLP
116 John Street, Suite 2310
New York, NY  10038
joseph@sarrafgentile.com